UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

D.F. and V.S, individually and on behalf of J.F., a child
with a disability,

                               Plaintiffs,

                   - against -

CITY SCHOOL DISTRICT OF THE CITY OF NEW
YORK, D/B/A NEW YORK CITY DEPARTMENT
OF EDUCATION,

                              Defendant.

**<u>OPINION AND ORDER</u>**

15 Civ. 1448 (ER)

<u>Ramos, D.J.</u>:

      D.F. and V.S. ("Plaintiffs") are the parents of J.F., a ten year old child classified with autism.  J.F. attended fifth grade during the 2012-2013 school year at a private school that provides special education services.  Plaintiffs bring this suit against the New York City Department of Education ("DOE") under the Individuals with Disabilities Education Act ("IDEA"), seeking funding of the tuition owed to the private school for the 2012-2013 school year.  Plaintiffs claim entitlement to the tuition based on the DOE's alleged failure to offer J.F. a free appropriate public education for his fifth grade year, as the IDEA requires.

      Before this Court are the parties' cross-motions for summary judgment.  Docs. 7, 9.[1]  For the reasons set forth below, the parties' motions are DENIED.  The case is remanded to the SRO for further development of the administrative record and, if necessary, additional factfinding.

---

[1] "Doc." references are to ECF docket numbers in Case No. 15-cv-1448.

## I. STATUTORY FRAMEWORK

### A. The IDEA

Congress enacted the IDEA to encourage the education of children with disabilities. *E.A.M. ex rel. E.M. v. N.Y.C. Dep't of Educ.*, 11 Civ. 3730 (LAP), 2012 WL 4571794, at *1 (S.D.N.Y. Sept. 29, 2012) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)). The statute mandates that any state receiving federal funds must provide a free appropriate public education ("FAPE") to children with disabilities. 20 U.S.C. § 1412(a)(1)(A) (2012); *Rowley*, 458 U.S. at 179. The FAPE provided by the state must include "special education and related services" tailored to meet the unique needs of the particular child, 20 U.S.C. § 1401(9), and must be "reasonably calculated to enable the child to receive educational benefits," *Rowley*, 458 U.S. at 207.

A public school ensures that a student with disabilities receives a FAPE by providing the student with an Individualized Education Plan ("IEP"). *See Polera v. Bd. of Educ.*, 288 F.3d 478, 482 (2d Cir. 2002). An IEP is a written statement, collaboratively developed by the parents of the child, educators, and specialists, that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (quoting *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012)).

Because New York State receives federal funds under the IDEA, it must comply with the requirements of the statute. *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998). In New York, the task of developing an IEP rests with local Committees on Special Education ("CSEs"), whose members are appointed by the board of education or trustees of the

school district.  *Id.* (citing NY. Educ. Law § 4402(1)(b)(1); *Heldman ex rel. T.H. v. Sobol*, 962

F.2d 148, 152 (2d Cir. 1992)).  "CSEs are comprised of members appointed by the local school

district's board of education, and must include the student's parent(s), a regular or special

education teacher, a school board representative, a parent representative, and others." *R.E.*, 694

F.3d at 175 (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)).  "In developing a child's IEP, the CSE is

required to consider four factors: '(1) academic achievement and learning characteristics, (2)

social development, (3) physical development, and (4) managerial or behavioral needs.'"

*E.A.M.*, 2012 WL 4571794, at *1 (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105,

107–08 (2d Cir. 2007)).

       To provide a FAPE, an IEP must "be reasonably calculated to enable the child to receive

educational benefits," *Gagliardo*, 489 F.3d at 107 (citation and internal quotation marks

omitted), "likely to produce progress, not regression," and afford the student with an opportunity

to achieve greater than mere "trivial advancement," *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d

186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130) (internal quotation marks omitted).

"A school district is not, however, required to provide every special service necessary to

maximize each handicapped child's potential," *Cerra*, 427 F.3d at 195 (citation and internal

quotation marks omitted), or "everything that might be thought desirable by loving parents,"

*Walczak*, 142 F.3d at 132 (citation and internal quotation marks omitted).  Rather, the IDEA calls

only for selection of a program that provides a "basic floor of opportunity."  *Walczak*, 142 F.3d

at 132 (internal quotation marks omitted); *id.* at 130 ("IDEA does not itself articulate any

specific level of educational benefits that must be provided through an IEP.").  "[B]ecause public

'resources are not infinite,' federal law 'does not secure the best education money can buy; it

calls upon government, more modestly, to provide an appropriate education for each [disabled]

child.'"  *Id.* (quoting *Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C. Cir. 1984)

(Ruth Bader Ginsburg, J.)); *see also C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 72

(2d Cir. 2014).  Furthermore, under an IEP, "education [must] be provided in the least restrictive

setting consistent with a child's needs" and the CSE must "be mindful of the IDEA's strong

preference for 'mainstreaming,' or educating children with disabilities to the maximum extent

appropriate alongside their non-disabled peers."  *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217,

224 (2d Cir. 2012) (citations and internal quotation marks omitted).

In addition to imposing the IEP requirement, the IDEA provides for due process

procedures to promptly resolve disputes that arise between parents and school districts, so that

children will receive appropriate special education services.  20 U.S.C. § 1415(b)(6)–(b)(7).

New York State has implemented a two-tiered system of administrative review for disputes

regarding "any matter relating to the identification, evaluation or educational placement of a

student with a disability…or the provision of a [FAPE] to such a student."  *Id.*; 8 NYCRR §

200.5(i)(1).  First, "[p]arents may challenge the adequacy of their child's IEP in an 'impartial due

process hearing' before an [Impartial Hearing Officer ("IHO")] appointed by the local board of

education."  *E.A.M.*, 2012 WL 4571794, at *2 (quoting *Gagliardo*, 489 F.3d at 109).  Either

party may then appeal the IHO's decision to the New York State Review Officer ("SRO"), an

officer of New York State's Board of Education tasked with conducting an impartial review of

the proceedings.  *Id.*; 34 C.F.R. 300.514(b)(2); 8 NYCRR § 279.1(d).

After the SRO has rendered its decision, either party may then appeal to either state

supreme court or federal district court.  N.Y. Educ. Law § 4404(3)(a).  If appealed to federal

district court, the court must "receive the records of the administrative proceedings" and, if

requested by the parties, hear additional evidence.  20 U.S.C. § 1415(i)(2)(C).  The district court

then "grant[s] such relief as the court determines is appropriate," based on the preponderance of the evidence. *Id.* Under the statute, "appropriate" relief may include reimbursement for the cost of a private school placement. *E.A.M.*, 2012 WL 4571794, at *2 (citations omitted).

## B. Claims for Tuition Reimbursement under the IDEA

"'Parents who…believe that a FAPE is not being provided to their child may unilaterally enroll the child in a private school and seek tuition reimbursement from the school district' by filing what is known as a 'due process complaint.'" *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (quoting *Hardison v. Bd. of Educ.*, 773 F.3d 372, 376 (2d Cir. 2014); citing N.Y. Educ. Law § 4404(1), 20 U.S.C. § 1412(a)(10)(C)(ii)). Parents who unilaterally place their child in a private school do so "at their financial risk." *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 215 (2d Cir. 2014).

"'The Supreme Court has established the three-pronged *Burlington/Carter* Test to determine eligibility for [tuition] reimbursement, which looks to (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities.'" *C.F.*, 746 F.3d at 73 (citation and internal quotation marks omitted).[2]

With specific respect to the first *Burlington-Carter* prong, "challenges to a school district's proposed placement school must be evaluated prospectively (i.e., at 'the time of the parents' placement decision') and cannot be based on mere speculation." *M.O.*, 793 F.3d at 244 (quoting *R.E.*, 694 F.3d at 195). Thus, evaluation of the IEP must be based only on information available to the parent at the time he or she was considering the IEP and the school district's

---

[2] The *Burlington/Carter* test is named after two Supreme Court cases: *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370, 374 (1985), and *Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15–16 (1993).

proposed placement, and not on retrospective evidence that came to light after the parent chose

to reject the district's placement and enroll the child in private school.  *See, e.g.*, *id.*; *R.E.*, 694

F.3d at 188.

    "Under New York's Education Law § 4404(1)(c), the local school board bears the initial

burden of establishing the validity of its plan at a due process hearing.  If the board fails to carry

this burden, the parents bear the burden of establishing the appropriateness of their private

placement and that the equities favor them."  *R.E.*, 694 F.3d at 184 (citing *Cerra*, 427 F.3d at

192).[3]  The district court retains discretion over whether to award tuition reimbursement.  *See* 20

U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer *may* require the agency to reimburse

the parents for the cost of [private] enrollment.") (emphasis added).

## II. REVIEW OF ADMINISTRATIVE RECORD

### A. Background Facts

    J.F., a ten year old during the 2012-2013 school year, has been diagnosed with Pervasive

Developmental Disorder ("PDD"), auditory processing disorder, expressive and receptive

language disorders, hypotonia, and fine/gross motor deficits.  Tr. 401, 501.[4]  J.F. struggles with

language processing and sensory processing, and takes medication for anxiety.  Tr. 81, 401; Ex.

3-1; Ex. 9-2.[5]  These difficulties limit J.F.'s ability to remain focused, and can result in anger and

---

[3] "[T]o the extent that a court 'must determine whether the state administrative decisions were supported by a preponderance of the evidence, which party bore the burden of persuasion in the state review scheme is only relevant if the evidence was in equipoise.'"  *Reyes*, 760 F.3d at 215 (quoting *M.H.*, 685 F.3d at 225 n.3).

[4] "Tr." references are to the transcript of the impartial hearing held before the Impartial Hearing Officer on September 11, 2012, October 1, 2012, November 26, 2012, and December 14, 2012.

[5] All "Ex." references are to exhibits as they were designated upon being entered into the record by the Impartial Hearing Officer.  *See* Impartial Hearing Officer's Findings of Fact and Decision, Case No. 139808 (January 14, 2013) at 19.

frustration.  Tr. 368, 403.  At times, this manifests in behaviors including head banging, screaming, and feet stomping.  Tr. 412; Ex. 9-2.

J.F. was evaluated under New York's Early Intervention Program when he was eighteen-months old.  Tr. 405.  At that time, J.F. began attending an inclusive preschool with the assistance of a 1:1 paraprofessional, and received speech and language therapy, applied behavioral analysis therapy, occupational therapy, physical therapy, and family training and counseling.  Tr. 405-07; *see* Ex. 6 (2005 Psychosocial Evaluation).  Upon turning five, J.F. was enrolled at Herbert J. Birch Early Childhood Center Annex ("Birch"), a DOE-approved private school, where he was placed in an 8:1:2 classroom (one teacher, two paraprofessionals, and no more than eight students).  Tr. 409.  J.F. attended Birch from kindergarten through second grade. Tr. 411.

By the end of second grade, J.F's parents felt that J.F.'s needs were not being met at Birch.  Tr. 411.  In response, they unilaterally enrolled J.F. at the Cooke Center for Learning and Development ("Cooke") for the 2010-2011 school year.  Tr. 412, 445.

## B. 2012 IEP Meeting

On March 22, 2012, the DOE convened a CSE meeting to develop an IEP for J.F. for the 2012-2013 school year ("2012 IEP" or "IEP").  *See* Ex. 3; Ex. 4.  The CSE was comprised of J.F.'s mother (Plaintiff V.S.), a DOE school psychologist (Dr. Steven Abramowitz), a special education teacher who also served as the DOE representative (Derick Townsend), the school psychologist at Cooke (Cheryl Tuttle), and J.F.'s teacher at Cooke for the 2011-2012 school year (Bindia Shah).  Ex. 3-13; Ex. 4-1; Ex. B-1; Ex. 9-1.[6]

---

[6] A parent representative did not attend the meeting, but J.F.'s parents waived their right to have one present.  Ex. B-1.

At the IEP meeting, the CSE reviewed and considered two items:  (1) J.F.'s IEP from the previous year (the "2011 IEP") and (2) a progress report dated March 2012, which was prepared by J.F.'s instructors at Cooke (the "Progress Report").  Tr. 26, 73; Ex. 9.  At Cooke, students are generally placed in self-contained classes of eight to twelve students.  Ex. G-1.  J.F.'s Cooke Progress Report indicates that he received instruction in groups of varying sizes and with various levels of support.  For example, in reading, J.F. received instruction in a group of seven, with one teacher and one assistant teacher, whereas in science J.F. was taught in "a whole group setting," with one teacher, one assistant teacher, and three paraprofessionals.  Ex. 9-3, 9-10.  During art, lunch, recess, assemblies, plays, gym, and library, J.F. was mainstreamed with general education students, meaning he participated alongside typically developing peers.  Ex. 9-1.

The Progress Report documents J.F.'s progress in eleven different subjects, including reading, writing, math, social studies, science, speech therapy, counseling, occupational therapy, story art, yoga, and "kids in the game."  *See* Ex. 9-1 to 9-19.  For each subject, except for the latter three, the Progress Report quantifies J.F.'s proficiency in a variety of course-specific skills.  *Id.*  Each subject specifies between three to nine skills that are rated by the respective instructor.  *Id.*  For example, in counseling, the Progress Report contains three skills:  Social Skills, Problem Solving, and Self-Esteem.  *Id.* at 13-14.  For each skill, J.F.'s instructor provided a rating on a one to four scale.  *Id.*  The Progress Report contains ratings for both the first trimester of the school year, ending in November 2011, and for the second trimester, ending in March 2012.  *Id.*

Each subject also contains a comment section in which J.F.'s instructors detail J.F.'s areas of growth, his learning style, the supports from which he benefits, and the difficulties that impede his focus.  *Id.*  As with the skill ratings, the Progress Report contains comments on J.F.'s

performance during both the first trimester and second trimester of the 2011-2012 school year.
*Id.*

In addition to providing information based on his teachers' observations, the Progress
Report also includes the results of several objective assessments of J.F.  The Progress Report
includes J.F.' s results in the GRADE and Leveled Reading Inventory, which assess reading
skills, and in the GMADE and Star Math tests, which assess math skills.  Ex. 9-20-26.  The
GRADE reading assessment and GMADE math assessment include results across three different
dates in 2010 and 2011, and the Star Math assessment contains results across five different dates
in 2010 and 2011.  Ex. 9-22 to 9-26.

At the time of the IEP meeting, the CSE also had available to it a December 16, 2010
classroom observation of J.F. ("2010 Classroom Observation"), *see* Ex. 5, and a 2010
neurodevelopmental evaluation of J.F. ("2010 Neuro Evaluation"), *see* Ex. 8; Tr. 73.  Neither
report, however, was reviewed or considered at the IEP meeting.  Tr. 73-74.

The 2010 Neuro Evaluation made a number of recommendations as to J.F.'s school
placement.  It recommended that J.F. be enrolled in a twelve-month program, that he continue to
be enrolled in a "highly-structured, language-based school, with a low student-to-teacher ratio,"
and that he should attend "a special education program embedded in a mainstream facility, so
[J.F.] is surrounded by typical role models and has structured learning opportunities with peer
models."  Ex. 8-7. The Evaluation elaborated that J.F.'s "classroom should be supportive of his
social needs, yet provide him with social role models."  *Id.*

The 2010 Classroom Observation found that in a class of 11 students, J.F. "was easily
distracted and had difficulty with performing tasks requested."  Ex. 5-2.  Furthermore, "his

interactions with peers were minimal," though he was "more responsive to adult interactions."

*Id.*

## C. The 2012 IEP and Placement Offer

The IEP developed by the CSE classifies J.F. as a student with autism, and provides an overview of J.F.'s present levels of performance and individual needs in the areas of academics, social development, physical development, and management.  Ex. 3-1.  With regard to J.F.'s social-emotional needs, the IEP stated that J.F. "is no longer reliant on a behavioral plan," and indicated that J.F. does not require a behavioral intervention plan ("BIP").  Ex 3-1 to 3-2.  The IEP did list, though, a number of strategies found necessary to address J.F.'s management needs, including small group instruction, direct teacher modeling, use of manipulatives, multisensory approach, graphic organizers, redirection to task, visual and auditory cues, repetition and review of instructions and material, breathing/counting exercises to cope with frustration, and a sensory diet including sensory breaks, compression vest, chewing gum, tactile fidget toys, and the use of a TheraBand.  *Id.*

In addition to detailing J.F.'s current performance levels and needs, the IEP included annual goals, which described what J.F. would be expected to achieve by the end of the 2012-2013 school year.  Ex. 3-1 to 3-7.  The IEP specified nine annual goals in different subject areas, which are broken down into a total of 38 short-term objectives.  *Id.*  Although the IEP indicated that J.F.'s needs warranted an Adaptive Physical Education ("APE") program, the IEP did not explicitly supply an APE annual goal or any APE short-term objectives.  *Id.*

In order for these needs and goals to be met, the IEP recommended that J.F. be placed in a twelve-month, 6:1:1 class (one teacher, one paraprofessional, and no more than six students) in

a specialized school.  Ex. 3-8.  In addition, the IEP provided that J.F. should receive speech-language therapy, occupational therapy, and counseling services each week.  *Id.*

The IEP noted that that the CSE considered recommending a 12:1:1 class (one teacher, one paraprofessional, and no more than twelve students) in a specialized school as an alternative.  Ex. 3-12.  However, according to the IEP, the CSE concluded that a 12:1:1 class would not provide enough support for J.F.  *Id.*

The IEP also contained notes under the heading "Parent Concerns," which stated that J.F.'s parents "expressed concerns that [a] 12:1:1 setting is not enough support, while a 6:1:1 setting is too restrictive."  *Id.*  The IEP documented the parents' belief that J.F. "is a social child and needs to interact with his peers," and that "a 6:1:1 ration will not provide [J.F.] with such opportunities."  *Id.*

On June 21, 2012, the DOE issued Plaintiffs a Final Notice of Recommendation offering placement at a District 75[7] school containing 6:1:1 classes to implement the IEP.  Ex. 10.  By letter dated June 29, 2012, Plaintiff V.S. informed the DOE that she had visited the recommended placement and found it inappropriate.  Ex. C.  The DOE did not respond to her letter, and thus Plaintiffs chose to continue J.F.'s enrollment at Cooke for the 2012-2013 school year.  Tr. 440.

On September 5, 2012, Plaintiffs entered into an enrollment contract with Cooke for the 2012-2013 school year.  Ex. E.  The contract states that in the event Plaintiffs seek to obtain funding from the DOE, Plaintiffs must "take all necessary steps to secure such funding as

---

[7] District 75 is the DOE's separate system of schools and home and hospital programs that "provides citywide educational, vocational, and behavior support programs for students who are on the autism spectrum, have significant cognitive delays, are severely emotionally challenged, sensory impaired and/or multiply disabled." *About D75*, NEW YORK CITY DEPARTMENT OF EDUCATION, http://schools.nyc.gov/Academics/SpecialEducation/D75/AboutD75/default.htm (last visited Mar. 7, 2016).

promptly as possible and to cooperate fully in the process required to secure such funding." *Id.* at 2.  Otherwise, Plaintiffs must pay tuition of $48,500 for J.F.'s enrollment at Cooke. *Id.* at 1.

**D. Impartial Hearing and the IHO's Decision**

On July 11, 2012, Plaintiffs timely filed a Due Process Complaint seeking funding for J.F.'s tuition.  Ex. 1.  Plaintiffs alleged that the DOE failed to offer J.F. a FAPE for the 2012-2013 school year on both procedural and substantive grounds.  *See id.*  Specifically, Plaintiffs asserted that:  (1) the IEP was not based upon sufficient evaluative material; (2) the IEP did not include goals to address J.F.'s social-emotional needs, (3) the IEP did not recommend parent training and counseling; (4) the IEP goals were generic and vague; (5) the IEP did not contain goals tied to J.F.'s Adaptive Physical Education needs; and (6) the 6:1:1 recommended placement in a specialized school was inappropriate and overly restrictive.  Ex. 1-2 to 1-3.  Most pertinent here is Plaintiffs' last objection, that the DOE's recommended placement was overly restrictive.  *See id.*

An impartial hearing was convened and took place over four days on September 11, 2012, October 1, 2012, November 26, 2012, and December 14, 2012.  The IHO heard testimony from nine witnesses.  In her decision, the IHO relied primarily upon the testimony of J.F.'s mother, V.S., the district representative, Derick Townsend, the district psychologist, Dr. Steven Abramowitz, and the Cooke psychologist, Cheryl Tuttle, who, as described above, comprised the CSE that formulated J.F.'s 2012 IEP.

With regard to the IEP's recommended placement, Plaintiff V.S. testified that J.F. "was in an odd position of needing enough support, needing enough adults around to give him that 1:1 support when he becomes dysregulated, but also needing the larger classroom of 12 students." Tr. 417.  She explained that J.F. "really needed to have children [around him] who were

interested in social interaction and who were more advanced in their social skills." Tr. 419.  V.S.

further stated that "six students is a very small very restricted group to be in," but that Mr.

Townsend and Dr. Abramowitz told her that a 6:1:1 class "was the only thing they thought they

could offer," because a 12:1:1 "doesn't come with a 12-month placement and he needed a 12-

month placement because he does lose skills over the summer."  Tr. 417.  V.S. elaborated that "it

was one of those he doesn't quite fit in either one, but let's offer him the 6:1:1 because it comes

with a 12-month program and it's what we have."  Tr. 418.

Ms. Tuttle, the school psychologist at Cooke, testified that "just about everybody" at the

IEP meeting, including Plaintiff V.S., Mr. Townsend, and Dr. Abramowitz, "felt [that] 6:1:1 was

too restrictive, but [that] 12:1:1 as provided in public schools was not enough support."  Tr. 209-

10.  Ms. Tuttle explained that Mr. Townsend and Dr. Abramowitz felt that a 6:1:1 was "not the

best place for [J.F.], because there would not be enough good role models for him," but that

"they were not able to come up with anything else, because [J.F.] needed the summer services

and because of his classification."  Tr. 210-11.  Ms. Tuttle also testified that the possibility of a

12:1:1 class with an additional paraprofessional was discussed, but that "everyone kind of

agreed" that J.F. needed somebody who "could help more with his education rather than have

somebody hovering over him."  Tr. 211.

Ms. Tuttle took notes during the meeting, which were also submitted to the IHO.  With

regard to the IEP's placement recommendation, Ms. Tuttle wrote:

> The team cannot recommend Cooke but mom wished they could provide
> something comparable.  She felt 6:1:1 was too restrictive, but 12:1:1 as
> provided in the public schools was not enough support.  DOE did not have
> a middle ground.  [Dr. Abramowitz] suggested that a health management
> para be added to give him the additional support, but it was acknowledged
> that this type of assistance was not what he needed.  He needs an
> additional teacher in the class so that he has that type of expertise for small
> group learning situations.  [Dr. Abramowitz] said he thinks [J.F.] would

13

> regress in a D75[8] program but he needs the summer services because, without that, he would regress substantially. . . . The consensus appeared to be that the D75 would not be a good fit for him.

Ex. B-2 to B-3.

Mr. Townsend, the district representative, testified that J.F. "would benefit from fewer children in the class [where] the teacher could focus on him during the time that he would need to take a break because it states in his IEP that he needs sensory breaks."  Tr. 63.  When asked if his recollection was that the CSE thought a 6:1:1 setting was "the most appropriate recommendation for the student," Mr. Townsend answered yes.  Tr. 64.

Dr. Abramowitz also testified that he thought a 6:1:1 placement was an appropriate recommendation for J.F.  Tr. 489.  Dr. Abramowitz explained that a 6:1:1 program "is generally for children who . . . have a diagnosis of autism or PDD or fall somewhere along the spectrum" and that a 6:1:1 is "highly specific to meet the child's needs based on the diagnostic criteria of spectrum disorders."  *Id.*

The IHO issued her decision on January 14, 2013.  *See* Impartial Hearing Officer's Findings of Fact and Decision, Case No. 139808 (January 14, 2013) ("IHO"), at 3-17.  The IHO denied Plaintiffs' request for funding and found that the DOE had offered J.F. a FAPE.  *Id.* at 17.

**E. IHO Findings on J.F.'s Recommended Placement**

With regard to Plaintiffs' objection to J.F.'s placement in a specialized 6:1:1 school, the IHO found that "[s]tate regulations require that a student with management needs that are determined to be highly intensive and requiring a high level of individualized attention, shall not exceed six students."  IHO at 14-15 (citing 8 NYCRR § 200.6(h)(4)(ii)(a)).  The IHO concluded

---

[8] D75 is shorthand for District 75, the DOE's separate system of specialized schools for special education students.  *See supra*, n.7.

that "[b]ased on the student's academic and social emotional management needs, . . . the recommend[ed] program was appropriate for the student and would have addressed his needs as reflected in the evaluative information before the CSE." IHO at 15. The IHO also relied on the testimony of Mr. Townsend and Dr. Abramowitz, who stated that a 6:1:1 class was appropriate for J.F. because he would benefit from a smaller class that could meet his needs. IHO at 12-13.

The IHO acknowledged testimony from Ms. Tuttle that Dr. Abramowitz stated during the IEP meeting that he did not believe a 6:1:1 program was appropriate for J.F., as well as notes Ms. Tuttle kept at the IEP meeting stating that Dr. Abramowitz thought J.F. "would regress in a D75 program." IHO at 13. The IHO found, however, that "[w]hile it is possible Dr. Abramowitz expressed concerns in considering the appropriateness of the 6:1:1 class as opposed to the 12:1:1, I am not persuaded by Ms. Tuttle's testimony that either Dr. Abramowitz or Mr. Townsend recommended a placement for the student thought to be inappropriate to meet the student's individual needs." *Id.*

The IHO also acknowledged evidence that J.F.'s parents had expressed similar concern at the IEP meeting that a 6:1:1 placement was too restrictive. *Id.* The IHO responded that the CSE had considered other, less restrictive programs, though, and found that they would be inappropriate. *Id.* The IHO explained that this included a 12:1:1 class in a specialized school as well as a 12:1:1 class with the additional support of a 1:1 health management paraprofessional.[9] However, according to notes kept by Ms. Tuttle and the IEP itself, the CSE felt that these placements would not provide enough structure or educational support given J.F.'s needs. *Id.*

---

[9] The IHO states in her opinion that the CSE also considered "a special *6:1:1* class with the additional support of a 1:1 health management professional," but it is clear from the IHO's references to the record that she meant a *12:1:1* class with the additional support of a 1:1 health management paraprofessional, and that this was a clerical error on her part.

The IHO also cited testimony from Dr. Abramowitz, who stated that "[a] 12:1:1 program is in a community based school where children are expected to meet curriculum standards" and work more independently, and do not have a lot of sensory needs or a long list of supports like J.F. does.  *Id.*   Furthermore, the IHO highlighted that it was undisputed that J.F. required a twelve-month school year, which a 6:1:1 placement would provide.  *Id.*

The IHO next responded to Plaintiff V.S. and Ms. Tuttle's advocacy for a program comparable to J.F.'s current placement at Cooke, finding that such a placement would also be inappropriate.  *Id.* at 13-14.  The IHO referred to the December 16, 2010 Classroom Observation of J.F., in which he was observed in an eleven-person class, with a teacher, an assistant, and an aide.  *Id.* at 14.  The Observation notes that J.F. was easily distracted, had difficulty performing tasks, and required individual attention.  *Id.*  The IHO also referred to testimony by J.F.'s 5th grade teacher at Cooke, Christie Distefano, who stated that during the 2012-2013 year, J.F. was the only student in the class exhibiting behaviors like screaming, head banging, and scripting, and that his social needs were higher compared to the rest of the class.  *Id.*

The IHO did note testimony from Dr. Abramowitz that within a 6:1:1 program there is a "high degree of variability" in opportunities for mainstreaming, and that the 2012 IEP does not specifically provide for mainstreaming opportunities despite recommendations that J.F. be given the opportunity to interact with typically developing peers.  *Id.*  The IHO found, however, that "the record fails to establish that the student requires mainstreaming in order to make progress and the lack of specifically articulated mainstreaming opportunities on the IEP does not rise to the level of a denial of FAPE."  *Id.*[10]

---

[10] The IHO also addressed Plaintiffs' contentions concerning the CSE's use of sufficient evaluative data, the adequacy of the IEP's goals, and the lack of parent counseling in the IEP, but found them unavailing.

**F. Appeal to the New York State Review Officer**

Plaintiffs timely appealed the IHO's decision to the SRO on various grounds, and the SRO issued her decision on October 27, 2014.  *See* Office of State Review Appeal, No. 13-021 (Oct. 27, 2014) ("SRO"), at 4-7 (reviewing parties' arguments on appeal of IHO decision).  The SRO denied Plaintiffs' claim for tuition funding, agreeing with the IHO and concluding that the 2012 IEP provided J.F. with a FAPE.  SRO at 7.

With regard to Plaintiffs' contention that the CSE's recommended placement was too restrictive for J.F., the SRO found that the IHO correctly determined that the CSE's recommendation of a 6:1:1 class in a specialized school "provided appropriate functional grouping to address [J.F.'s] academic, management, physical, behavioral, and social needs." SRO at 6.  The SRO cited 8 NYCRR 200.6(h)(4)(ii)(a) to explain that a 6:1:1 special class placement is designed to meet management needs which are "highly intensive," and require "a high degree of individualized attention and intervention."  *Id.*  In light of this regulation, The SRO concluded that the hearing record showed that J.F. indeed demonstrated "intensive management needs such that he required extra support and accommodations including small group instruction, direct teacher modeling, one to one modeling, sensory breaks, sensory tools, directions read, re-read and rephrased, manipulatives, graphic organizers, charts, graphs, checklists, redirection to task, visual and auditory cues and aids, structured schedule, previewing, repetition and review of materials, coping strategies, sensory diet, exercise, OT, speech-language therapy and counseling services."  *Id.*

The SRO also cited testimony from Dr. Abramowitz indicating that a 6:1:1 class was chosen for J.F. based on him being "quite academically delayed," and that his teacher during the 2012-2013 school year, Ms. Distefano, stated that J.F. required "one to one instruction at least

17

every five minutes," and that his social needs were more intensive than the rest of his classmates. *Id.* The SRO thus concluded that "the March 2012 CSE recommendation of a 6:1+1 special class was reasonably calculated to enable the student to receive educational benefits for the 2012-13 school year; and further provided the student with the necessary support without being overly restrictive." *Id.*[11]

## III. DISCUSSION

### A. Standard of Review by the Federal District Court

Upon an aggrieved party's appeal of the SRO's decision to the federal district court, the court must review the entirety of the administrative record in addition to supplemental evidence upon either party's request.  20 U.S.C. § 1415(i)(2)(C)(i)–(ii).[12]  Though IDEA appeals tend to come before the district court as a motion for summary judgment, the existence of a genuine issue of material fact does not necessarily result in denial of the motion.  *See, e.g.*, *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).  "Rather, the motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA [in developing the specific IEP at issue] and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits."  *M.H.*, 685 F.3d at 225–26 (citation and internal quotation marks omitted).  "Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]."  *Id.*

---

[11] The SRO also addressed Plaintiffs' other contentions concerning the CSE's use of sufficient evaluative data, the adequacy of the IEP's goals, and the lack of parent counseling in the IEP, but found them unavailing.

[12] The parties did not submit any supplemental evidence here, and rely exclusively on the administrative record.

Courts reviewing administrative decisions under the IDEA must determine whether the decision is supported by a preponderance of the evidence. *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003) (citation omitted). This review is not, however, "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Rather, "'[t]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed.'" *C.F.*, 746 F.3d at 77 (quoting *Gagliardo*, 489 F.3d at 112–13). Both the Supreme Court and the Second Circuit and "have interpreted the IDEA as strictly limiting judicial review of state administrative decisions." *Grim*, 346 F.3d at 380–81 (citing *Rowley,* 458 U.S. at 204–08; *Walczak,* 142 F.3d at 129). This Court must therefore "give 'due weight' to the administrative proceedings, 'mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Id.* at 381 (quoting *Walczak*, 142 F.3d at 129). "The standard of review 'requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review.'" *C.F.*, 746 F.3d at 77 (quoting *M.H.*, 685 F.3d at 244).

As the Second Circuit has articulated, the level of deference owed by this Court to the administrative findings below must "hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive[.]" *M.H.*, 685 F.3d at 244. Most critically, the "deference owed depends on both the quality of the opinion and the court's institutional competence." *C.F.*, 746 F.3d at 77. The Court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned," *R.E.*, 694 F.3d at 189, and the Court's "determination of the persuasiveness of an

administrative finding must also be colored by an acute awareness of institutional competence and role," *M.H.*, 685 F.3d at 244.  Thus, for example:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures.  Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress.  Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not.  And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

*M.H.*, 685 F.3d at 244 (citations omitted).  Finally, although the district court is not prohibited from reversing IHO and SRO decisions that are in agreement, the law in this Circuit counsels strongly against doing so.  *See, e.g.*, *B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343, 360 (E.D.N.Y. 2014).

"Ultimately, judicial review of administrative determinations under the IDEA requires the court (1) to conduct an independent review of the administrative record, (2) use a preponderance of the evidence standard, and (3) give deference to the administrative determinations, particularly that of the SRO."  *F.L. ex rel. F.L. v. N.Y.C. Dep't of Educ.*, No. 11-CIV-5131 (RKE), 2012 WL 4891748, at *5 (S.D.N.Y. Oct. 16, 2012), *aff'd*, 553 F. App'x 2 (2d Cir. 2014).

**B. Whether an IEP is Adequate**

In order to determine whether an offered IEP is adequate, courts engage in a multistep review process.  *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009).  First, courts examine whether the state has complied with the procedures mandated by the IDEA.  *Id.*  This inquiry is "no mere formality," since "adequate compliance with the procedures prescribed w[ill] in most cases assure much if not all of what

Congress wished in the way of substantive content in an IEP." *Walczak v. Fla. Union Free Sch. Dist.,* 142 F.3d 119, 129 (2d Cir.1998) (internal quotation marks omitted). "However, it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *A.C.,* 553 F.3d at 172 (internal marks omitted).  A procedural violation renders an IEP legally inadequate only when the violation (1) "impeded the child's right to a [FAPE], (2) "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE]," or (3) "caused a deprivation of educational benefits."  *E.A.M.*, 2012 WL 4571794, at *6 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)); *see also Werner v. Clarkstown Cent. Sch. Dist.*, 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005) (finding that procedural violations "do not automatically require a finding of a denial of a FAPE.").  However, "procedural inadequacies that individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP constitute a denial of a FAPE."  *Werner*, 363 F. Supp. 2d at 659.

After reviewing a school district's actions for procedural compliance, courts consider whether the IEP "is reasonably calculated to enable the child to receive educational benefits." *Cerra*, 427 F.3d at 192.  Thus, an IEP is substantively adequate if it "provides personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."  *D.D-S. v. Southold Union Free Sch. Dist.*, 09 Civ. 5026 (JS) (WDW), 2011 WL 3919040, at *11 (E.D.N.Y. Sept. 2, 2011), *aff'd sub nom. D. D-S. v. Southold Union Free Sch. Dist.*, 11-4697, 2012 WL 6684585 (2d Cir. Dec. 26, 2012) (quoting *Rowley,* 458 U.S. at 203) (internal quotation marks omitted).  As stated above, the IEP must "be reasonably calculated to enable the child to receive educational benefits," *Gagliardo*, 489 F.3d at 107 (citation and internal quotation marks omitted), "likely to produce progress, not regression,'" and afford the

student with an opportunity greater than mere "trivial advancement." *Cerra*, 427 F.3d at 195

(quoting *Walczak*, 142 F.3d at 130) (internal quotation marks omitted).  Furthermore, there is "a

strong preference for children with disabilities to be educated, to the maximum extent

appropriate, together with their non-disabled peers."  *Walczak*, 142 F.3d at 122 (citation and

internal quotation marks omitted).  However, a school district is not required to provide "every

special service necessary to maximize each handicapped child's potential," *Cerra*, 427 F.3d at

195 (citation and internal quotation marks omitted), or "everything that might be thought

desirable by loving parents." *Walczak*, 142 F.3d at 132 (citation and internal quotation marks

omitted).

When deciding whether a school district has met its obligations under the IDEA, a court

"must examine the record for any objective evidence indicating whether the child is likely to

make progress or regress under the proposed plan."  *Cerra*, 427 F.3d at 195 (citation and internal

quotation marks omitted).  A court cannot choose, however, between the competing views of

experts on matters of educational policy or substitute its own judgment for that of the hearing

officers which it reviews.  *Id.* (citing *Briggs v. Bd. of Educ. of Conn.*, 882 F.2d 688, 693 (2d Cir.

1989).  Questions of an IEP's substantive adequacy are thus ones in which "substantial deference

is owed to the judgments of state administrative officers."  *Doe v. E. Lyme Bd. of Educ.*, 790

F.3d 440, 450 (2d Cir. 2015) (citing *Cerra*, 427 F.3d at 191).  "'[C]ourts lack the specialized

knowledge and experience necessary to resolve persistent and difficult questions of educational

policy.'"  *Id.* (quoting *Rowley*, 458 U.S. at 208); *see also Cerra*, 427 F.3d at 195 ("Because

administrative agencies have special expertise in making judgments concerning student progress,

deference is particularly important when assessing an IEP's substantive adequacy."); *Grim*, 346

F.3d at 382 ("[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of administrative officers.").

**C. Application to J.F.'s 2012 IEP**

The Court remands this proceeding to the SRO for clarification and additional factfinding, if necessary, as to whether J.F.'s recommended placement in a 6:1:1 class in a specialized school is appropriate.  Specifically, further analysis is required as to whether this placement complies with the IDEA's mandate that students be educated in the least restrictive environment.

It is an express requirement of the IDEA that a student's recommended placement be provided in the least restrictive environment ("LRE"):

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).  This requirement "expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers."  *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 161 (2d Cir. 2014) (citing *Walczak*, 142 F.3d at 122).

Whether a student's recommended placement is in the LRE is a substantive question, and requires courts to "engage in an individualized and fact-specific inquiry into the nature of the student's condition and the school's particular efforts to accommodate it."  *P. v. Newington*, 546 F.3d 111, 113 (2d Cir. 2008).  The Second Circuit in *P. v. Newington Board of Education* formulated a two part test, in which courts must ask (1) "whether education in the regular

classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child," and if not, then (2) "whether the school has mainstreamed the child to the maximum extent appropriate."  *Id.* at 120.

The LRE requirement "is not absolute," however, and "does not require a school district to place a student in the single least restrictive environment in which he is capable of any satisfactory learning." *Cornwall*, 752 F.3d at 162.  This is because "the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students." *Newington*, 546 F.3d at 119.  Thus, "the IDEA contemplates that the DOE will consider a continuum of related services and options that will be a 'best fit' for the student in question," and achieve an "*optimal* result across the two requirements." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 145-46 (2d Cir. 2013).  Importantly, a school district "cannot avoid the LRE requirement just by deciding not to operate certain types of educational environments; instead, it must provide a continuum of alternative placements that meet the needs of the disabled children that it serves." *Cornwall*, 752 F.3d at 165-66.

Plaintiffs asserted in their Due Process Complaint that the CSE's recommendation of a 6:1:1 class in a specialized school was "wholly inappropriate and overly restrictive."  Ex. 1-3.  The SRO did not properly evaluate, however, whether that was the case.

In her decision, the SRO noted that a "6:1+1 special class placement is designed for those students 'whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention.'" SRO at 6 (quoting 8 NYCRR 200.6(h)(4)(ii)(a)).  The SRO then cited three pieces of evidence indicating that J.F. has intensive management needs:  (1) the accommodations listed in J.F.'s 2012 IEP; (2) testimony by Dr. Abramowitz's that J.F. is "quite academically delayed"; and (3) testimony by J.F.'s 5th grade

teacher Christie Distefano that in an 11 person class, J.F. required "one to one instruction at least every five minutes," and that his social needs were more intensive than the rest of his classmates. *Id.* Given this information, the SRO made the determination that the "2012 CSE recommendation of a 6:1+1 special class was reasonably calculated to enable the student to receive educational benefits for the 2012-13 school year; and further provided the student with the necessary support without being overly restrictive." *Id.*

The Court recognizes that a 6:1:1 classroom is designed for students with intensive management needs. The SRO, however, did not provide any explanation as to why J.F.'s needs (however extensive) could not be met in a less restrictive environment than a 6:1:1 class.[13] Yet that is precisely the analysis that administrative officers must conduct under the IDEA. The SRO was required to apply the test set out in *Newington* and consider whether the DOE's recommended placement "mainstreamed the child to the maximum extent appropriate." 546 F.3d at 120 (emphasis added). The SRO made no reference to mainstreaming opportunities in a 6:1:1 classroom however, let alone question whether the DOE properly considered "a continuum of related services and options" to find the optimal balance between mainstreaming and the ability to meet J.F.'s needs. *M.W.*, 725 F.3d at 146. The SRO merely recited evidence describing J.F.'s management and academic needs, and concluded, without any additional analysis, that a 6:1:1 placement would not be "overly restrictive." *Id.*

---

[13] To the extent Ms. Distefano's testimony about J.F.'s behavior during the 2012-2013 school year might suggest that J.F. requires a more restrictive environment than an eleven person classroom, that evidence should not have been considered. In assessing whether a student was denied a FAPE, "[a] court may consider only the information that was available to the parents at the time that they rejected the recommended placement." *J.W. v. N.Y.C. Dep't of Educ.*, 95 F. Supp. 3d 592, 604 (S.D.N.Y. 2015). Retrospective evidence discovered after the parent's decision was made may not be considered. *See Scott ex rel. C.S. v. N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 445 (S.D.N.Y. 2014); *see also R.E.*, 694 F.3d at 185-89. Because J.F. was not in Ms. Distefano's class until after Plaintiffs had already rejected the DOE's recommended placement, information about his behavior in that class should not have been considered by the administrative officers in assessing whether J.F. was denied a FAPE.

In so finding, the SRO made no reference to significant evidence in the record bearing on this very question, including:

- J.F.'s 2012 Progress Report from Cooke, which provided extensive informal and formal evaluative information of J.F.'s progress in a less restrictive setting than the recommended placement, Ex. 9;

- Parent testimony expressing concern that a 6:1:1 class would be too restrictive, and that J.F. requires positive role models to progress, Tr. 417-19;

- Testimony from Ms. Tuttle, the school psychologist at Cooke, that members of the CSE expressed concerns during the IEP meeting that a 6:1:1 class would be too restrictive, Tr. 209-12, 225;

- Notes taken by Ms. Tuttle during the IEP meeting, which state that "[t]he consensus" was that a 6:1:1 in a specialized school "would not be a good fit," and that Dr. Abramowitz said during the meeting that he thought J.F. would "regress" in a 6:1:1 class, Ex. B-3;

- Testimony from Mr. Townsend, the district representative, and Dr. Abramowitz, the district psychologist, indicating that the CSE thought a 6:1:1 placement was appropriate for J.F., Tr. 64, 489;

- Testimony, notes taken by Ms. Tuttle, and notes in the IEP itself, indicating that the CSE considered a 12:1:1 classroom, but that the team thought J.F. required more structure, Tr. 211, 417-418; Ex. B-2 to B-3; Ex. 3-12;

- Notes taken by Ms. Tuttle during the IEP meeting that a 12:1:1 classroom with an additional paraprofessional was also considered, but that the CSE concluded that this would still not provide enough teacher support for J.F, Ex. B-2 to B-3;

- A 2010 Neuropsychological test suggesting that mainstreaming is important for J.F., but also that J.F. needs structure and a low teacher to student ratio, Ex. 8;

- A 2010 classroom observation of J.F. indicating that in a class of eleven students, J.F. "was easily distracted and had difficulty with performing tasks requested," Ex. 5-2.

The Court notes in particular that the SRO did not discuss J.F.'s 2012 Cooke Progress Report, which was one of just two documents relied on by the CSE in making its placement recommendation, in addition to J.F.'s 2011 IEP. The Progress Report includes information about J.F.'s development in twelve different classes, teachers' comments on J.F.'s learning habits and

challenges, and objective assessments administered over the course of several dates during the school year leading up to the 2012 IEP meeting.  Thus, what would appear to be particularly relevant evidence in assessing whether J.F. could progress in a less restrictive setting was not part of the analysis engaged in by the SRO.

The Court also notes that while the IHO did address much of the evidence listed above, she, like the SRO, did not employ the standard set out in *Newington* to assess whether J.F.'s recommended placement was in the LRE.  After recognizing that there is "a high degree of variability" in opportunities for mainstreaming in a 6:1:1 classroom, the IHO concluded:  "[T]he record fails to establish that the student requires mainstreaming in order to make progress and [I] find the lack of specifically articulated mainstreaming opportunities on the IEP does not rise to the level of a denial of FAPE."  IHO at 14.  The IDEA's LRE mandate, however, is not that the DOE must provide a placement with mainstreaming only to the extent that the student is found to require mainstreaming.  Rather, the DOE must maximize a student's mainstreaming opportunities *regardless* of whether a student is found to require mainstreaming or not.  *See Newington*, 546 F.3d at 122 ("Children with disabilities *must* be educated with their non-disabled peers '[t]o the maximum extent appropriate.'") (quoting 20 U.S.C. § 1412(a)(5)(A)) (emphasis added).

Thus, the Court concludes that neither the SRO nor the IHO made a proper determination as to whether the CSE's recommended placement was in the LRE.  Because the Court finds that there is substantial evidence in the record bearing on the appropriateness of J.F.'s recommended placement, and because the Court recognizes that the SRO is better suited to evaluate that evidence, the Court remands this proceeding to the SRO for consideration pursuant to the standard set out in *Newington*.

"A court may remand a proceeding when it needs further clarification or does not have sufficient guidance from the administrative agencies."  *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 463 (2d Cir. 2014) (quoting *T.L. v. N.Y.C. Dep't of Educ.*, 938 F. Supp. 2d 417, 436 (E.D.N.Y. 2013)) (internal marks omitted).  A remand is appropriate when the educational expertise of the IHO and SRO is necessary to resolve an issue.  *See J.F. v. N.Y.C. Dep't. of Educ.*, No. 12 Civ. 2184 (KBF), 2012 WL 5984915, at *10 (S.D.N.Y. Nov. 27, 2012) (remanding to the IHO to determine the adequacy of a student's proposed public school classroom, because "the adequacy of [a student's] proposed classroom placement . . . is a question this Court is ill-equipped to decide in the first instance," as it "involves important questions of educational policy and requires educational expertise to resolve."); *see also F.B. v. N.Y.C. Dep't. of Educ.*, No. 12 Civ. 1669 (PAE), 2013 WL 592664, at *15 (S.D.N.Y. Feb. 14, 2013) ("The Court is ill-equipped to address these claims [regarding the Department of Education's recommended school placement] in the first instance.  The Court instead remands them to the SRO to consider, based on the voluminous record created during the administrative process.").

Whether J.F.'s placement in a 6:1:1 classroom in a specialized school is too restrictive raises significant questions of educational policy and practice that are properly left to the administrative agencies to evaluate in the first instance.  If it is found that J.F. was denied a FAPE, the SRO is respectfully directed to evaluate whether Cooke was an appropriate alternative placement, and whether equitable considerations favor reimbursement of J.F.'s tuition for the 2012-2013 school year.  Furthermore, remand by the SRO to the IHO or other action at the state level is not precluded by this decision.

**IV. CONCLUSION**

For the foregoing reasons, the parties' motions for summary judgment are DENIED without prejudice.  The proceeding is remanded to the SRO for additional findings consistent with this opinion.  The Clerk of the Court is respectfully directed to terminate the motions, Docs. 7, 9.

It is SO ORDERED.

Dated:    March 31, 2016
          New York, New York

_____
Edgardo Ramos, U.S.D.J.